COLORADO COURT OF APPEALS                                    2016COA151

Court of Appeals No. 14CA1142
La Plata County District Court No. 13JD15
Honorable Jeffrey R. Wilson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

In the Interest of T.B.,

Juvenile-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE RICHMAN
Bernard, J., specially concurring
Fox, J., dissenting

Announced October 20, 2016

Cynthia H. Coffman, Attorney General, Kevin E. McReynolds, Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Lord Law Firm, LLC, Kathleen A. Lord, Denver, Colorado, for Juvenile-
Appellant

¶ 1     Two teenage girls alleged that a teenage boy, the juvenile T.B.,

had raped them.  During the investigation into those allegations,

the police discovered that the juvenile had used his cell phone to

solicit, to receive, and to store nude photographs of teenage girls.

The police identified and confirmed the ages of two of the girls

depicted in the photographs, E.H. and L.B.

¶ 2     The prosecution filed a delinquency petition that charged the

juvenile with sexual assault, kidnapping, third degree assault,

aggravated juvenile offender, and, based on the photographs of E.H.

and L.B., two counts of sexual exploitation of a child.

¶ 3     The trial court granted the juvenile's request to sever the two

sexual exploitation counts from the rest of the counts.  A jury

acquitted him of the sexual assault, kidnapping, third degree

assault, and aggravated juvenile offender counts.

¶ 4     The court then presided over a bench trial on the sexual

exploitation of a child counts.  At the trial's end, the court found

that the prosecution had proved, beyond a reasonable doubt, that

the juvenile had committed two counts of sexual exploitation of a

child, adjudicated the juvenile delinquent, sentenced him to two

1

concurrent two-year terms of sex offender probation, and required him to register as a sex offender.

¶ 5     The juvenile appeals the court's decision to adjudicate him delinquent.  We affirm.

## I.     Background

¶ 6     The juvenile met E.H. and L.B. at a Future Farmers of America conference in September 2012.  The juvenile and L.B. were then fifteen years old, and E.H. was seventeen years old.  After the conference, the juvenile stayed in touch with both girls by telephone and text messaging because they lived in different towns.

### A.     E.H.

¶ 7     E.H. testified during the trial that, in the fall of 2012, the juvenile had texted her photographs of his erect penis.  When E.H. received them, "[she] deleted them" because she "didn't want to keep those on [her] phone."

¶ 8     The juvenile repeatedly asked her to send him nude photographs of herself.  She said that "[t]he first time [she] told him no.  Then after that [she] was like well, maybe after a while, and

then just kind of like getting him off [her] case, and then finally [she] just gave in."

¶ 9 She sent him three nude photographs of herself. The police later recovered these photographs from his cell phone. The prosecution introduced them to the court during the bench trial.

¶ 10 E.H. added that the juvenile said that she "look[ed] good" in these photographs. He asked for more. She declined because she "was very ashamed of [herself.]" When her mother later found out about these photographs, "it really crushed [E.H.] morally" because E.H. had "always tried to be the best person [that she could] be."

B. L.B.

¶ 11 L.B. testified at trial that, in the spring of 2013, the juvenile had texted her a photo of his erect penis. He proceeded to send her a series of texts asking her to send him nude pictures of herself. She eventually texted him a photograph that showed her topless. The police recovered this photograph from the juvenile's cell phone, and the prosecution introduced it to the court.

¶ 12 The juvenile continued to text photographs to L.B. of his erect penis even after he had been arrested.

## II. Sufficiency of the Evidence

¶ 13    The juvenile asserts that, for two reasons, the evidence is insufficient to support his adjudication for sexual exploitation of a child. First, he submits that the evidence did not show that the photographs of E.H. and L.B. depicted "erotic nudity," which is a necessary component of the crime of sexual exploitation of a child. Second, he contends that the statute prohibiting sexual exploitation of a child does not forbid one teenager from possessing a nude photograph of another teenager as long as both teenagers are over the age of fourteen. We disagree with both contentions.

### A. Standard of Review

¶ 14    The juvenile asserted at trial that (1) nude photos do not meet the erotic nudity definition necessary to prove sexual exploitation of a child; and (2) the chain of custody was insufficient to show that the juvenile knew that he possessed the nude photographs of E.H. and L.B. on his cell phone. So, he expressly preserved his first sufficiency of the evidence contention — that under the sexual exploitation statute the photographs of E.H. and L.B. did not depict erotic nudity.

4

¶ 15    But the juvenile did not argue to the trial court that the sexual

exploitation statute did not apply at all to defendant's conduct in

this case.  Thus, his second argument was not expressly preserved.

¶ 16    The juvenile and the prosecution disagree about what

standard of review should apply to the juvenile's second,

unpreserved, sufficiency of the evidence contention.

¶ 17    The prosecution argues that we should review this

unpreserved assertion only for plain error.  *See People v. McCoy*,

2015 COA 76M, ¶ 70 (Webb, J., specially concurring) (*cert. granted*

October 3, 2016); *People v. Lacallo*, 2014 COA 78, ¶¶ 12, 30-31.

¶ 18    The juvenile asserts that we should apply "de novo" review.

*See Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005) (whether the

record contains sufficient evidence to support conviction is reviewed

de novo); *People v. Mantos*, 250 P.3d 586, 589 (Colo. App. 2009)

(meaning of statute is a question of law subject to de novo review).

But the term "de novo" describes the standard by which we

determine whether an error occurred, and does not describe the test

we apply to determine whether an error requires reversal. Even if

plain error review applies, we determine whether an error occurred

by applying the de novo review per *Dempsey*. What the juvenile apparently means by the use of this term is that if we conclude that the evidence is insufficient we must vacate the conviction, and no retrial occurs, in effect a form of "structural error." *See McCoy*, ¶ 30.

¶ 19     We recognize that there is disagreement on this court about which of these standards of review should apply in these circumstances. *See McCoy*, ¶ 68 (Webb, J., specially concurring) (citing cases showing disagreement). We are persuaded by the majority's reasoning in *McCoy*, ¶¶ 5-36, and the reasoning of the special concurrences in *Lacallo*, ¶¶ 59-73 (Román, J., concurring in part and dissenting in part), and *People v. Rediger*, 2015 COA 26, ¶ 67 (Richman, J., specially concurring) (*cert. granted* Feb. 16, 2016), so we shall apply that reasoning in this case. *See People v. White*, 179 P.3d 58, 60-61 (Colo. App. 2007) (one division of the court of appeals is not obligated to follow the decision of another).

¶ 20     We review both contentions challenging the sufficiency of the evidence in accord with the standards set forth in *Dempsey*, 117 P.3d at 807, to determine whether the court erred. In doing so, we

consider whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, was substantial and sufficient to support a conclusion by a reasonable mind that the defendant was guilty of the charge beyond a reasonable doubt. *People v. Wentling*, 2015 COA 172, ¶ 8; *see also Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). If we decide the court erred, we will not consider whether the error was obvious, or whether the error cast serious doubt on the reliability of the judgment of conviction. *Cf. Rediger*, ¶ 11.

### B. The Sexual Exploitation of a Child Statute

¶ 21 The sexual exploitation of a child statute states, as relevant here, that

> (3) A person commits sexual exploitation of a child if, for any purpose, he or she knowingly:
>
> . . .
>
> (b.5) Possesses or controls any sexually exploitative material for any purpose . . . .

§ 18-6-403(3)(b.5), C.R.S. 2016.

¶ 22 "'Sexually exploitative material' means any photograph . . . that depicts a child engaged in, participating in, observing, or being used for explicit sexual conduct." § 18-6-403(2)(j).  In this context, a child is "a person who is less than eighteen years of age." § 18-6-403(2)(a).

¶ 23 For the purposes of our analysis, the statutory definition of "explicit sexual conduct" includes "erotic nudity." § 18-6-403(2)(e).

> "Erotic nudity" means the display of the human male or female genitals or pubic area, the undeveloped or developing genitals or pubic area of the human male or female child, the human breasts, or the undeveloped or developing breast area of the human child, for the purpose of real or simulated overt sexual gratification or stimulation of one or more of the persons involved.

§ 18-6-403(2)(d).

## C. Trial Court Findings

¶ 24 When the trial court adjudicated the juvenile delinquent at the end of the bench trial, it made a series of factual findings:

- E.H. and L.B. were less than eighteen years old when they took the photographs of themselves and texted them to the juvenile.

8

- The juvenile knew that E.H. and L.B. were under eighteen years old.

- The juvenile knew that he had received the nude photographs; indeed, he had complimented one of the girls on her appearance.

- The juvenile possessed the nude photographs because they were on his cell phone when the police examined it.

- There was an adequate chain of custody between the police seizure of the cell phone and the copies of the photographs of the girls that the prosecution introduced as evidence partially because, during trial, the girls had identified the copies as being the photographs that they had texted to the juvenile.

- The juvenile repeatedly asked E.H. and L.B. for nude photographs after he had sent them photographs of his erect penis. The nude photographs of the girls were therefore erotic nudity.

- The juvenile was guilty, beyond a reasonable doubt, of both counts of sexual exploitation of a child.

D.    The First Sufficiency of the Evidence Contention

¶ 25    We first address the juvenile's contention that the evidence was insufficient to prove that he knew that he possessed photographs depicting erotic nudity.  We review the evidence de novo in the light most favorable to the prosecution, and, after doing so, we conclude that the evidence was sufficient.  *See Clark*, 232 P.3d at 1291; *Dempsey*, 117 P.3d at 807.

1.    Chain of Custody

¶ 26    The juvenile first contends that the chain of custody linking his cell phone and the photographs of E.H. and L.B. admitted at trial was insufficient.  He argues the chain of custody was insufficient because it did not show that the photographs were accurate copies of the photographs that were on the juvenile's telephone.  We are not persuaded.

¶ 27    E.H. and L.B. identified the trial photographs as copies of the ones that they had taken of themselves and that they had texted to the juvenile, using his cell phone number.  E.H. also testified that the juvenile had complimented her on her photographs.

¶ 28    The evidence showed that the police had searched the juvenile's cell phone.  They had found the photographs of E.H. and

10

L.B., nude photographs of other girls, and photographs of the juvenile's erect penis. A digital forensic officer testified that the data in the juvenile's cell phone had not been tampered with and that the photographs from E.H. and L.B. had been opened and viewed.

¶ 29　　Any purported deficiencies in the chain of custody, such as a lack of clarity about which police officer had made the copies of the photographs from the juvenile's cell phone, went to the weight that the trial court gave the photographs, not to their admissibility. *See People v. Moltrer*, 893 P.2d 1331, 1335 (Colo. App. 1994).

¶ 30　　We conclude that this evidence established, beyond a reasonable doubt, that (1) the photographs the prosecution introduced during the bench trial were the nude photographs that E.H. and L.B. had texted to the juvenile; and (2) the defendant knew what these photographs showed and who sent them. In other words, we conclude that there was sufficient evidence to prove that the juvenile knowingly possessed the nude photographs of E.H. and L.B.

2.　　Erotic Nudity

11

¶ 31    The juvenile asserts that the photographs did not contain erotic nudity because E.H. and L.B. did not take them for their own sexual satisfaction.  This contention assumes that the reference to "persons involved" in the definition of erotic nudity necessarily means the people who are displayed in the photograph.  We disagree.

¶ 32    A photograph qualifies as "erotic nudity" if it meets two conditions.  First, as relevant here, the photograph must depict the female genitals, pubic area, or breasts of a child.  § 18-6-403(2)(d); *People v. Gagnon*, 997 P.2d 1278, 1281-82 (Colo. App. 1999).  Second, the depiction in the photograph must be for the purpose of real or simulated overt sexual gratification or stimulation of one or more of the persons involved.  § 18-6-403(2)(d); *Gagnon*, 997 P.2d at 1281-82.

¶ 33    The juvenile does not dispute that the photographs met the first condition, so we turn to the second.  When analyzing the second condition, we consider whether (1) the focal point of the visual depiction was on the child's breasts, genitals, or pubic area; (2) the setting of the visual depiction was sexually suggestive, such

12

as in a place or pose generally associated with sexual activity; (3) the child was depicted in an unnatural pose, or in inappropriate attire, considering the child's age; (4) the child was fully or partially clothed, or nude; (5) the visual depiction suggested sexual coyness or a willingness to engage in sexual activity; and (6) the visual depiction appeared to be intended or designed to elicit a sexual response in the viewer. *Gagnon*, 997 P.2d at 1282.

¶ 34    The focal points of the photographs in this case were the nude breasts of E.H. and L.B. and E.H.'s pubic area. There was sufficient evidence to support the conclusion that the girls' poses were unnatural and suggestive: in one photograph, E.H. was standing in front of a mirror when she took a photograph of her nude body reflected in the mirror; in another photograph, L.B.'s shirt is pulled down below her breasts, exposing them. The photographs suggested a sexual coyness. And they appeared to be intended and designed to elicit a sexual response from the juvenile. Some of the text messages between the juvenile and L.B. further confirm the conclusion that the juvenile requested pictures of her for the purposes of sexual gratification and arousal. For example, some

referred to a "dirty pic" and a picture shortly after she showered. Their text message discussions included references to intercourse, like "I can probe u lol . . . Stick my d*** in u lol," "wow no love u to f*** u too," and "We're gunna f*** lol :)."

¶ 35     Our supreme court has rejected the juvenile's contention that the focus of the "overt sexual gratification" component of the definition of erotic nudity could only be the persons depicted in the photographs.  Rather, "[t]he person (or persons) 'involved' are not always depicted in the material" and "the sexual gratification of that person need not be shown in the material." *People v. Batchelor*, 800 P.2d 599, 604 (Colo. 1990).  In other words, "if the sexual gratification is of a person not in the material, the sexual gratification of that person need not be shown in the material." *Id.* So, following the supreme court's reasoning, we conclude that, in this case, "the overt sexual gratification was of" the juvenile, who repeatedly asked the girls for the photographs after sending them a picture of his erect penis. *Id.*

¶ 36     We also disagree with the juvenile's attempt to distinguish *Batchelor* by pointing out that the defendant in that case was an

14

adult.  The age of the defendant was not a factor in the analysis of whether the sexual gratification element was met.

E.    The Second Sufficiency of the Evidence Contention

¶ 37    The juvenile asserts for the first time on appeal that nude photographs taken by teenagers of themselves with no adult involvement cannot constitute "sexually exploitative materials" because they do not record any act of sexual abuse of a child.  He further asserts that such photos are a constitutionally protected form of speech because they express the teenager's sexuality to the extent that they are neither obscene nor the product of sexual abuse.  Finally, he suggests that "teen sexting" should only be prosecuted under a different statute, and that statute was not violated in this case.

1. Sexual Abuse of a Child

¶ 38    The juvenile argues that application of the statute to his conduct is limited to "sexually exploitative materials" that record "sexual abuse of a child."  He imports this limitation from the legislative declaration to the statute, which states: "The general assembly further finds and declares that the mere possession or

15

control of any sexually exploitative material results in continuing victimization of our children by the fact that such material is a permanent record of an act or acts of *sexual abuse of a child . . . .*" § 18-6-403(1.5) (emphasis added). According to the juvenile, teenagers who photograph their own bodies do not sexually abuse themselves, nor do they create a permanent record of any such abuse. Thus, he argues the evidence in this case was insufficient to support a conviction. We reject his argument for several reasons.

¶ 39    First, the plain language of the statute does not contain the phrase "sexual abuse" in its definitions of "sexually exploitative material," "explicit sexual conduct," or "erotic nudity." *See* § 18-6-403(2)(d), (e), (j). Because the statutory language is clear and unambiguous, we apply the statute as written and need not engage in further statutory analysis as urged by the juvenile. *See Bostelman v. People*, 162 P.3d 686, 689 (Colo. 2007); *People v. Vecellio*, 2012 COA 40, ¶ 14.

¶ 40    When a statute is ambiguous courts may consider the legislative declaration or purpose. § 2-4-203, C.R.S. 2016. For example, in *People v. Renander*, 151 P.3d 657 (Colo. App. 2006),

16

this court considered the legislative declaration at issue here to determine whether each offending image could be a separate chargeable offense. *Id.* at 661-62. But it did so only after finding ambiguity in the term "any." *Id.*

¶ 41    When a statute is unambiguous, courts generally apply the plain and ordinary meaning of terms without examining the legislative declaration. *See Bostelman*, 162 P.3d at 690; *Stamp v. Vail Corp.*, 172 P.3d 437, 442–43 (Colo. 2007).

¶ 42    In this case, because the statute is unambiguous, we do not consider the legislative declaration. As set forth above, the contested provisions are clear. The statute defines "sexually exploitative material" as a series of visual materials that "depict[] a child engaged in, participating in, observing, or being used for explicit sexual conduct." § 18-6-403(2)(j). It then defines the term "explicit sexual conduct" to include, among other things, erotic nudity. § 18-6-403(2)(e). It further defines "erotic nudity." § 18-6-403(2)(d). Because none of these definitions is ambiguous, we apply their plain and ordinary meanings. *Turbyne v. People*, 151 P.3d 563, 567 (Colo. 2007) (If the statutory language is clear, we

apply the plain meaning and we do not add words to the statute.).
The plain and ordinary meaning of "sexually exploitative material"
does not require depictions of sexual abuse of a child. None of the
definitions contains such a requirement. The legislative declaration
cannot replace or amend the clear definitions of terms.

¶ 43     Second, even if we did consider the legislative declaration, the
outcome remains the same because the legislative declaration
cannot override a statute's elements. "To effectuate the intent of
the legislature, a statute must be read and considered as a whole
and should be interpreted so as to give consistent, harmonious, and
sensible effect to all of its parts." *Stamp*, 172 P.3d at 444. The
juvenile's edit to the language would immunize behavior otherwise
criminalized under the statute. This is not consistency and
harmony; it is conflict. Such emendation also risks undermining
the legislative intent by excluding images deemed harmful to
children. The juvenile's proposed revision also adds confusion by
introducing the new undefined term of "sexual abuse of a child."

¶ 44     On this point, *People v. Enea*, 665 P.2d 1026 (Colo. 1983), is
instructive. There, the supreme court rejected an attempt, like the

18

juvenile's here, to add an element to the sexual exploitation of a child statute based on language in the legislative declaration. *Id.* at 1028-29. Though involving an earlier version of the declaration and a different provision of the statute, the supreme court's holding is equally true here: "paragraph (1) is a statement of legislative purpose. The prefatory language does not alter the elements of the crime, which are set forth in paragraph (3)." *Id.* at 1029. Similarly, here the "prefatory language" cannot alter the elements outlined in paragraph (3)(b.5) or definitions in paragraphs 2(d), (e), and (j).

¶ 45     We thus reject the juvenile's effort to import a sexual abuse of a child component into the statutory elements.

### 2. Constitutionally Protected Speech

¶ 46     On appeal, the juvenile further argues that nude photographs taken by teenagers of themselves are constitutionally protected speech to the extent they are neither obscene nor the product of sexual abuse. He argues that unless the statute is interpreted as he suggests, it is unconstitutional as applied to him. We conclude this argument is not properly before this court. He did not challenge the constitutionality of the statute as applied to him

before the trial court. We will not assess constitutionality for the first time on appeal. *O'Quinn v. Baca*, 250 P.3d 629, 630 (Colo. App. 2010); *see also People v. Greer*, 262 P.3d 920, 936 (Colo. App. 2011) (J. Jones, J. concurring).

### 3. Teen Sexting

¶ 47    The juvenile also asserts a broader argument that the sexual exploitation of a child statute does not cover "teen sexting." This term refers to teenagers sending sexually explicit messages or images to one another by cell phone.

¶ 48    First, the juvenile uses the legislative declaration to argue the statute targets only adult conduct. He contends there is a meaningful difference between adult pedophiles possessing child pornography and teenagers with nude photos of their boyfriends or girlfriends. We disagree. The language of the statute covers proscribed behavior committed by teenagers involving images of other teenagers.

¶ 49    Under the statute's plain meaning, the perpetrator's age is irrelevant. Notwithstanding the dissent's valid contention that juveniles do not possess the emotional capabilities of adults, the

20

statute does not exempt teenagers.  Indeed, the Colorado criminal code contains no general exception for the criminal responsibility of teenagers.  True, the Colorado juvenile code has special procedural and sentencing rules for teenagers accused of criminal misconduct. *See* §§ 19-2-104, -512, -517, -907, -908, C.R.S. 2016.  But, even so, it does not immunize teenagers from responsibility, or alter the elements of crimes when committed by teenagers.  In short, when it comes to responsibility, teenagers are not a protected class.  Absent specific language in the statute, if a teenager's behavior satisfies the elements, a teenager is just as responsible as an adult.

¶ 50   In addition to covering perpetrators who are teenagers, the statute also specifically addresses images of teenagers.  "Sexually exploitative material" includes visual material depicting a child in certain circumstances.  § 18-6-403(2)(j) & (3)(b.5).  A child is a person under the age of eighteen.  § 18-6-403(2)(a).  Most teenagers fall within the statute's definition of "child."[1]  Nothing in the statute

---

[1] Although the headers in the juvenile's briefs argue the statute does not criminalize "nude 'selfies' exchanged between teenagers older than fourteen," the juvenile never articulates a reason behind this age cutoff.  Our analysis does not turn on the earliest age of a teenager.

distinguishes a person possessing or controlling the visual material and the child depicted. Second, the juvenile makes a more nuanced argument that the legislature intended to carve out protection for the specific behavior of teen sexting. He relies on the legislative history and text of a different statute — the Internet child exploitation statute — which outlaws "importun[ing], invit[ing], or entic[ing]" certain conduct through, among other means, text messaging if "the actor knows or believes [the victim] to be under fifteen years of age and at least four years younger than the actor." § 18-3-405.4(1), C.R.S. 2016. The juvenile also notes that in 2009 the legislature amended both the Internet child exploitation statute and the sexual exploitation of a child statute.

¶ 51    These are two different criminal statutes, and we do not read the applicability of one to exclude the applicability of the other. They ban different behavior, have different punishments, and address different harms. *Compare* § 18-6-403(3)(b.5), *with* § 18-3-405.4. Behavior may violate one, both, or neither of these statutes. Generally, "[i]t is up to the prosecutor to determine which crimes to charge when a person's conduct arguably violates more than one

22

statute." *People v. Clanton,* 2015 COA 8, ¶10. A different statute's legislative history does not affect our interpretation of the child exploitation statute. If anything, it is telling that the legislature did not amend the sexual exploitation of a child statute to mirror the age-focused language of the Internet child exploitation statute.

¶ 52    Although the issue of teen sexting may be a growing matter of public concern, whether it should be illegal and, if so, under what circumstances is a policy decision for the General Assembly. By affirming this conviction we do not mean to encourage prosecution of such offenses, and we urge prosecutors to continue to use discretion as to such cases. But, the sexual exploitation of a child act criminalizes teen sexting when it meets the enumerated elements of the statute. These elements are clear and unambiguous. Although the consequences for a convicted teenager may be substantial, as pointed out in the dissent, when the evidence satisfies the elements of the statute, we must apply the statute as written.

¶ 53    Accordingly, we conclude that sufficient evidence exists to support the sexual exploitation convictions. The evidence

introduced at trial is sufficient to support the convictions, and the juvenile's statutory interpretation arguments are misplaced.

### III.    Right to a Jury Trial

¶ 54    The juvenile further contends that the court erroneously denied his statutory right to a jury trial on the sexual exploitation of a child counts after it severed them from the sexual assault, kidnapping, third degree assault, and aggravated juvenile offender counts.  He asserts that the court's decision to sever the counts deprived him of his statutory right to a jury trial, and, alternatively, that the court abused its discretion when it denied his request for a jury trial.  We disagree.

### A.    Law

¶ 55    As is pertinent to our analysis, section 19-2-107(1), C.R.S. 2016, states:

> In any action in delinquency in which a juvenile is alleged to be an aggravated juvenile offender . . . the juvenile or the district attorney may demand a trial by a jury of not more than six persons except as provided in section 19-2-601(3)(a), or the court, on its own motion, may order such a jury to try any case brought under this title . . . .

### B.    Effect of Severance

¶ 56    The juvenile asserts that the trial court's decision to sever the counts in this case from the sexual assault, kidnapping, third degree assault, and aggravated juvenile offender counts deprived him of his statutory right to a jury trial on the sexual exploitation counts. Focusing on the word "action," he asserts that all the counts together constituted one action. He therefore adds that he was entitled to a jury trial under section 19-2-107(1). We disagree.

¶ 57    The juvenile took a different position in the trial court. In his motion for a jury trial on the sexual exploitation of a child counts, he stated that the severed sexual exploitation counts constituted "an action":

> While *the action* against [the juvenile] does not allege either that he is an aggravated juvenile offender or that he has committed a crime of violence for these counts, the significance of the fact that the General Assembly granted the Court discretion, to order a large number of delinquency cases to be tried to a jury, cannot be overemphasized.

(Emphasis added.)

¶ 58    We therefore conclude that the juvenile waived the contention that he now raises on appeal. *See People v. Geisick*, 2016 COA 113, ¶ 16 (holding when a party removes an issue from a court's

25

consideration, the party has waived the issue and we may not review it on appeal).

## C. Abuse of Discretion

¶ 59 The juvenile also asserts that the trial court abused its discretion when it denied his request for a jury trial. We are not persuaded.

¶ 60 Section 19-2-107(1) provides juveniles with a statutory right to a jury trial in certain circumstances, and it allows courts — in their discretion — to empanel a jury in delinquency proceedings involving felony offenses. *People in Interest of A.B.-B.*, 215 P.3d 1205, 1207 (Colo. App. 2009).

¶ 61 We review a court's ruling on a juvenile's request for a jury trial in a delinquency proceeding for an abuse of discretion. *Id.* "Discretionary decisions will not be disturbed unless the court's action was manifestly arbitrary, unreasonable, or unfair." *Id.* at 1209 (citation omitted). Under the abuse of discretion standard, the test is not "whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of

reasonable options." *People v. Rhea*, 2014 COA 60, ¶ 58 (citation omitted).

¶ 62    The trial court denied the juvenile's motion for a jury trial without making any factual findings. We nonetheless conclude that the court did not abuse its discretion when it denied the motion because its decision fell within a range of reasonable options. *See id.*

¶ 63    Unlike the aggravated juvenile offender count, which a jury resolved, the juvenile did not have a statutory right to a jury trial on the sexual exploitation of a child counts. So, although the court did not grant the juvenile the additional discretionary benefit of a jury trial, it did not deprive him of any rights when it denied his request.

¶ 64    As the division observed in *People in Interest of A.B.-B.*, 215 P.3d at 1209, "[i]t is true that, following trial, A.B.-B. was required to register as a sex offender and he may suffer social stigma because of this adjudication." But the division added that such consequences were "little different from those associated with many prosecutions for abuses of young children." *Id.* at 1210. Thus, the division ultimately concluded that, despite these serious

27

consequences, the trial court did not abuse its discretion when it denied A.B.-B.'s request for a jury trial. We think that the same reasoning applies to this case.

## IV. Selective Prosecution

¶ 65 The juvenile asserts that the trial court should have granted his motion to dismiss the sexual exploitation of a child charges because the prosecutor selectively prosecuted him. He asserts that the prosecutor charged him because he was male. He asks that, at a minimum, we remand the case to the trial court for further proceedings on this issue. We disagree.

## A. Law

¶ 66 A prosecutor has "wide discretion in determining who[m] to prosecute for criminal activity and on what charge." *People v. Kurz*, 847 P.2d 194, 196 (Colo. App. 1992) (citing *People v. MacFarland*, 189 Colo. 363, 540 P.2d 1073 (1975)); *see also* Colo. Const. art. VI, § 13. "In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his

28

discretion." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted).

¶ 67    However, equal protection requires that a decision to prosecute not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* at 464-65 (citation omitted); *see also People v. Gallegos*, 226 P.3d 1112, 1117 (Colo. App. 2009). "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Armstrong*, 517 U.S. at 463.

¶ 68    The fact that some people escaped prosecution under a statute is not a denial of equal protection unless the prosecutor's selective enforcement of the statute was intentional or purposeful. *Kurz*, 847 P.2d at 196-97. A defendant must show that the alleged selective prosecution had a discriminatory effect and that it was motivated by a discriminatory purpose. *Id.* at 197. "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." *Armstrong*, 517 U.S. at 465 (citation omitted).

## B. Standard of Review

¶ 69 The parties disagree about what standard of review we should use to resolve the juvenile's selective prosecution contention. Citing *People v. Voth*, 2013 CO 61, ¶ 15, and *People v. Garcia*, 169 P.3d 223, 226 (Colo. App. 2007), the juvenile contends that we should review the trial court's decision for abuse of discretion because ruling on a motion to dismiss is within the trial court's discretion.

¶ 70 The prosecution responds that we should follow the majority of federal appellate courts that review such claims under the "clearly erroneous standard." *See, e.g.*, *United States v. Brantley*, 803 F.3d 1265, 1270 (11th Cir. 2015) (applying the clearly erroneous standard for factual findings and de novo standard for legal conclusions); *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012) (same).

¶ 71 We do not need to resolve this disagreement because we conclude that, even if we apply an abuse of discretion standard to the trial court's decision, the court's decision to deny the juvenile's motion was not manifestly arbitrary, unreasonable, or unfair. *See*

*People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002). And we reach that conclusion because the trial court found, based on facts in the record, that the prosecution was not motivated by discriminatory intent when it prosecuted the juvenile for the two counts of sexual exploitation of a child.

## C.     Procedural History

¶ 72     After the jury acquitted the juvenile of the first four counts, he filed a motion to dismiss the sexual exploitation of a child counts. He alleged that the prosecution was selectively prosecuting him because he was male. During a hearing on the motion, the prosecutor stated:

> I want to be perfectly clear. The reason [the juvenile] is being prosecuted for these sexually [exploitative] images charges is because of the other underlying charges with which he's facing. He's alleged to have sexually assaulted -- and is currently charged here and in New Mexico with sexually assaulting two of his classmates, and we have a [Rule] 404(b) witness, his half-sister, who is also making allegations that she was sexually assaulted, and this is why we have selected [the juvenile] for this particular prosecution.
>
> [Defense counsel is] correct, we do not prosecute most teenagers for possessing and distributing sexually [exploitative] images

31

because there are a lot of kids out there making incredibly stupid decisions to take pictures of their genitalia and send them to each other. This is a -- probably a larger number of people than anybody in the community cares to know about.

So as a policy, no, we typically do not prosecute those cases based upon the sort of short sighted and ignorant decisions that teenagers can make. However, when people that are in [the juvenile's] situation find themselves also, as the [prosecution is] alleging, sexually assaulting his classmates, in addition to possessing these images, yes, we do think that's worth prosecution and that's why we did it.

¶ 73     After the parties and the court discussed another case brought against a juvenile male within that jurisdiction on similar charges, defense counsel stated that the prosecution had added the charges in this case because the juvenile had refused to enter a guilty plea concerning the sexual assault, kidnapping, third degree assault, and aggravated juvenile offender counts. The prosecutor responded that

[o]ne, with respect to us filing it after the initial charges, I want to refresh everyone's recollection here, that [the prosecution was] making everybody aware that these were possible charges that we were continuing to investigate at the beginning of this case and

32

that we may upon the conclusion of that investigation add those charges. So I guess I sort of want to set it straight that it wasn't while we're going to plead not guilty and these charges get added, but I want to go back to the fact that we have been discussing these charges from the outset.

The vindictive prosecution, which was not alleged in their motion but is apparently being alleged now based upon our response, those charges go directly to what it is he's being charged with. He's being charged with sexual assault. These are sexually related charges with other teenage girls and they're being brought because we think [the juvenile's] behavior is dangerous and not for any vindictive purpose.

¶ 74 The court then denied the juvenile's selective prosecution motion. It stated:

The case law is pretty clear that in order for there to be a problem or a constitutional problem with selective prosecution, that selective prosecution has to be based upon an unjustifiable standard such as race, religion or other arbitrary classification, it has to have a discriminatory effect, motivated by a discriminatory purpose. . . .

In this case, it's pretty clear that [the juvenile] is not [a member of a] suspect classification, [the juvenile is] a young white male, so I don't see that being a discriminatory purpose. The [prosecutor] has explained that [the juvenile] got charged with this because of the other

33

> charges he is facing, and I do remember
> somewhat, I assume it's [a particular
> prosecutor], but I do remember someone
> talking about the potential additional charges
> being filed.  So at this time I'm going to deny
> that motion and not dismiss the case because
> of selective prosecution.

## D.    Analysis

¶ 75    The juvenile first asserts that the trial court erred when it stated that he could not be a victim of selective prosecution because he was a white male.  We agree that this is a misstatement of the law.  *See, e.g.*, *United States v. Diaz*, 961 F.2d 1417, 1420 (9th Cir. 1992) ("[C]ourts . . . have the authority to inquire into charging . . . decisions to determine whether the prosecutor is abusing her awesome power to favor or disfavor groups defined by their *gender*, race, religion or similar characteristics." (quoting *United States v. Redondo-Lemos*, 955 F.2d 1296, 1301 (9th Cir. 1992))) (emphasis added); *cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("Title VII's prohibition of discrimination 'because of . . . sex' protects men as well as women.") (citation omitted); *People v. Gandy*, 878 P.2d 68, 70 (Colo. App. 1994) (gender discrimination claim based on removal of male jurors was cognizable).

34

¶ 76    But, although the trial court made this legal mistake, we nonetheless conclude that the court did not err when it denied the juvenile's selective prosecution motion because it made factual findings that are supported by the record. The court found that (1) the prosecutor decided to add the sexual exploitation of a child counts because of the other, more serious charges that the juvenile faced; and (2) a prosecutor gave notice to the court and to the juvenile about the prospect of adding these counts as the investigation unfolded, which eventually led the police to E.H. and L.B. We conclude that the record supports these findings. *See People v. Gallegos*, 251 P.3d 1056, 1062 (Colo. 2011).

¶ 77    In other words, the trial court found that the juvenile had not established that the prosecution had acted with an impermissible discriminatory purpose. *See Kurz*, 847 P.2d at 197. And we add that our review of the record has not turned up any "clear evidence" to the contrary. *See Armstrong*, 517 U.S. at 465.

V.    Conclusion

¶ 78    The delinquency adjudication is affirmed.

JUDGE BERNARD specially concurs.

35

JUDGE FOX dissents.

JUDGE BERNARD, specially concurring.

¶ 79 I respectfully disagree with the majority's analysis of the second, unpreserved sufficiency-of-the-evidence contention in Parts II.A and II.E of the majority opinion. I therefore specially concur with those parts of the opinion. I concur without reservation in the rest of it.

¶ 80 I am persuaded by the majority's reasoning in *People v. Lacallo*, 2014 COA 78, ¶¶ 12, 30-31, the majority's reasoning in *People v. Rediger*, 2015 COA 26, ¶¶ 10-14, and the reasoning of the special concurrence in *People v. McCoy*, 2015 COA 76M, ¶ 70 (Webb, J., specially concurring). So I would apply that reasoning in this case. As a result, I would review the juvenile's second sufficiency-of-the-evidence claim for plain error.

¶ 81 Plain error review involves three questions: whether there was an error; if so, whether it was obvious; and, if so, whether the error cast serious doubt on the reliability of the judgment of conviction. *Rediger*, ¶ 11. "Where analyzing the evidence requires the preliminary interpretation of a statute" that the defendant did not raise in the trial court and that no Colorado court has decided, "the

37

initial focus is on obviousness." *Id.* at ¶ 12. In this context, we do not address the merits of a sufficiency-of-the-evidence claim if (1) it would have been difficult to figure out the meaning of "operative statutory terms" under existing Colorado law, *id.*; or (2) the contention concerning those statutory terms did not "implicate a 'well-settled legal principle that numerous courts elsewhere have uniformly embraced,'" *id.* (quoting *Lacallo*, ¶ 31). But, even if other courts have not consistently resolved the statutory interpretation question in a particular way, a sufficiency-of-the-evidence error is nonetheless obvious if the statute is unambiguous and its terms have common and ordinary meanings. *Id.* at ¶ 13. And, if the error is obvious, we must review the sufficiency of the evidence claim de novo. *Id.*

¶ 82     To summarize, plain error analysis in the sufficiency-of-the-evidence context will only reach a different result than de novo review if three things happen: we have to interpret a statute before we move on to analyzing the evidence in the context of that statute; we have to interpret the statute because the defendant has urged us to do so for the first time on appeal; and the defendant's

38

proposed interpretation of the statute is not obvious. *Id.* at ¶ 14. "Otherwise, whether or not review is for plain error, the analysis will start — and usually end — with examining the sufficiency of the evidence de novo." *Id.*

¶ 83 Because the first step in the analysis of this sufficiency-of-the-evidence contention is the interpretation of a statute that the juvenile did not raise in the trial court, I first focus on the obviousness prong of the plain error test. *See id.* at ¶ 12. I conclude, for the following reasons, that the statutory interpretation upon which the juvenile relies in making his sufficiency-of-the-evidence contention was not obvious.

¶ 84 First, the juvenile's contention has never been adopted by a Colorado appellate court, and it does not "involve[] a well-settled legal principle that numerous courts elsewhere have uniformly embraced." *See Lacallo,* ¶ 31. Indeed, the juvenile's appellate briefs do not cite one appellate decision from any court in the United States that has adopted this contention.

¶ 85 Second, the juvenile's contention is not based on a simple and plain assertion that the sexual exploitation statute was

unambiguous and that its terms had common and ordinary meanings, so a simple reading of the statute would have revealed the error. *See Rediger*, ¶ 13. Instead, his contention has a lot of moving parts, and some of them are complex.

¶ 86 The juvenile's contention analyzes the language of sexual exploitation of a child statute. It discusses the legislature's intent. It compares the sexual exploitation of a child statute to the language and the legislative history of a different statute, section 18-3-405.4, C.R.S. 2015, which addresses Internet exploitation. And, incorporating a constitutional contention, it asserts that "the creation of the texted images in this case did not involve sexual abuse of a child or criminal conduct," so the juvenile's possession of the photographs "cannot be banned without violating First Amendment guarantees."

¶ 87 So, based on my conclusion that the putative error that the juvenile identifies was not obvious, I would not address the merits of this sufficiency-of-the-evidence contention. *See Lacallo*, ¶ 32.

JUDGE FOX, dissenting.

¶ 88    I am unable to join the majority opinion — namely Parts II.E.1 and II.E.3 — because, as I discuss below, our juvenile justice system and the statute at issue, targeting sexual exploitation of children, were never intended to reach imprudent or irresponsible behavior by and among juveniles.  Here, a seventeen-year old and a fifteen-year old each voluntarily sent texts containing partially nude photographs (or sexts) to their then-boyfriend, T.B., who was then sixteen years old.  The record does not show that T.B. forwarded or shared those photographs.  And, although both teen girls also received sexts from T.B., they were not prosecuted.

I.    The Juvenile Justice System's Goals Are to Rehabilitate — Not to Irreparably Brand — Juveniles

¶ 89    The General Assembly intended the Children's Code to serve the welfare of children and the best interest of society.  § 19-1-102(2), C.R.S. 2016.  Thus, the General Assembly recognized that juveniles who violate the law should be treated differently than adults.  It therefore created a separate statutory system within the Children's Code, Article II, to handle the treatment and sentencing of juveniles who commit a delinquent act.  § 19-2-102, C.R.S. 2016.

41

Article II of the Children's Code focuses on the rehabilitation and accountability of the juvenile delinquent while protecting public safety. *Id.*; *see also Bostelman v. People*, 162 P.3d 686, 692 (Colo. 2007). Thus, the Children's Code's treatment of juveniles adjudicated delinquents should contrast with the adult criminal system, where the focus is on punishment, deterrence, and retribution. *Bostelman*, 162 P.3d at 692; *see also A.S. v. People*, 2013 CO 63. The goal is to help make the juvenile a productive member of society. *See* § 19-2-102(1); *accord In re Application of Gault*, 387 U.S. 1, 15-16 (1967) (recognizing that the juvenile system was developed in large part to facilitate the opportunity for juveniles to reform and become productive citizens).[1]

¶ 90    It makes sense to treat juveniles differently. Indeed, even the United States Supreme Court recognizes that "[i]nexperience [and] less education . . . make the teenager less able to evaluate the consequences of his or her conduct[.]" *Thompson v. Oklahoma*, 487

---

[1] Colorado, one of the first states to create a juvenile court, has a rich history in the juvenile justice realm. *See* Laoise King, *Colorado Juvenile Court History: The First Hundred Years*, 32 Colo. Law. 63 (Apr. 2003) (noting that the creation and use of juvenile courts allowed communities to recognize the humanity of children and their entitlement to justice).

U.S. 815, 835 (1988) (plurality opinion).  It is for that reason that "juveniles are not trusted with the privileges and responsibilities of an adult" and "why their irresponsible conduct is not as morally reprehensible as that of an adult."  *Id.*

¶ 91    Not infrequently, courts have relied on research about adolescent behavior and brain development to underscore the importance of exercising discretion when prosecuting juveniles.  In *Roper v. Simmons*, the Supreme Court — highlighting the research on adolescent behavior that supports the view that child offenders are less culpable and more capable of reform than adults who commit similar crimes — declared the juvenile death penalty unconstitutional.  543 U.S. 551 (2005).  In accepting the premise that adolescent offenders are less culpable, the Court cited research demonstrating that adolescents are generally more "impetuous" than adults and are thus "overrepresented statistically in virtually every category of reckless behavior."  *Id.* at 569 (citation omitted).

¶ 92    For similar reasons, the Supreme Court later held, in *Graham v. Florida,* 560 U.S. 48, 68 (2010), mandatory life without parole sentences for those under the age of eighteen to be

unconstitutional. The Court reasoned that juveniles are less culpable than adults and, therefore, are less deserving of the most severe punishments. *Id.* This presumption that juveniles are generally less culpable than adults is based on previous and ongoing "developments in psychology and brain science" which "continue to show fundamental differences between juvenile and adult minds" in, for instance, "parts of the brain involved in behavior control." *Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2464 (2012) (quoting *Graham*, 560 U.S. at 68). According to the Supreme Court, "[a]s compared to adults, juveniles have a 'lack of maturity and an underdeveloped sense of responsibility.'" *Graham*, 560 U.S. at 68 (quoting *Roper*, 543 U.S. at 569-70). Juveniles "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," *id.* (quoting *Roper*, 543 U.S. at 569-70), and "they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from" harmful settings, *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464 (alteration in original) (quoting *Roper*, 543 U.S. at 569). Finally, "a child's character is not as 'well formed' as an adult's . . . and his

44

actions [are] less likely to be 'evidence of irretrievabl[e] deprav[ity].'"[2] *Id.* (alteration in original) (quoting *Roper*, 543 U.S. at 570). Accordingly, "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Graham*, 560 U.S. at 68 (alteration in original) (quoting *Roper*, 543 U.S. at 573).

## II. Protecting Children from Sexual Exploitation

¶ 93 In contrast with the rehabilitative goals of Colorado's juvenile justice system, child pornography laws are meant to prevent the sexual abuse of children necessarily present in the making of child pornography. *See* § 18-6-403(3)(b.5), C.R.S. 2016; *see also People v. White*, 656 P.2d 690, 693 (Colo. 1983) (recognizing that the sex offender laws' primary purpose is to protect the public from proven

---

[2] Even justices not finding categorical Constitutional violations in these juvenile cases agree with this precept. *See Graham v. Florida*, 560 U.S. 48, 90 (2010) (Roberts, C.J., concurring in the judgment) ("*Roper*'s conclusion that juveniles are typically less culpable than adults has pertinence beyond capital cases."); *Roper v. Simmons*, 543 U.S. 551, 599 (2005) (O'Connor, J., dissenting) ("It is beyond cavil that juveniles as a class are generally less mature, less responsible, and less fully formed than adults, and that these differences bear on juveniles' comparative moral culpability.").

45

dangerous sex offenders).  Sexting, in comparison, generally

involves teens taking pictures of themselves, usually for their

boyfriend or girlfriend, and without the exploitative circumstances

that accompany the production of conventional child pornography.

The sexting at issue here entailed seventeen-year-old E.H. and

fifteen-year-old L.B., each voluntarily taking a photograph of

herself, and sending the photograph by text to another teen, T.B.;

these actions lack the exploitative element implicit in the laws

prohibiting child pornography.  Texting, including sexting, is not

uncommon among today's teens.[3]  To charge sexting between teens

---

[3] The cell phone is the most direct and most widely used mode of communication between young people.  Seventy-one percent of teens own a cell phone and seventy-six percent of teens have sent text messages — in fact, of teens with cell phones, twenty-five percent of teens aged twelve to fourteen text daily and fifty-one percent of teens aged fifteen to seventeen text daily.  *See* Amanda Lenhart, *Teens and Mobile Phones Over the Past 5 Years: Pew Internet Looks Back* 5, 8 (2009), available at https://perma.cc/6W77-NDZL.  A survey conducted on the topic of sexting reported that twenty percent of the teens surveyed have electronically sent or posted online a nude or semi-nude picture or video of themselves.  *See* The National Campaign to Prevent Teen & Unplanned Pregnancy, *Sex and Tech: Results from a Survey of Teens and Young Adults* 1 (2008), available at https://perma.cc/E8PX-BEJD.  Most teen sexting is sent between partners of a relationship (i.e., between boyfriend and girlfriend), or to someone the sender is interested in dating.  Seventy-one percent of teen girls and sixty-

in these circumstances as child pornography, a prosecutor must blatantly disregard the purpose and intent of the laws enacted to protect children from the predators who would exploit them. *See, e.g., Bond v. United States*, 572 U.S. ___, ___, 134 S. Ct. 2077, 2090-91 (2014) (condemning the attempt to prosecute a woman who placed "irritating chemicals" on her husband's mistress' door knob and mailbox under a statute criminalizing the possession and use of "chemical weapons," two actions the Court found to be "worlds apart"). Consensual teen sexting is worlds apart from a predator's sexual exploitation of a child. Criminalizing the conduct at issue here under the sexual exploitation statute — section 18–6–403(3)(b.5) — turns a law that was intended to shield minors into a sword used against their imprudent conduct. The expansive interpretation given by the trial court, and affirmed here,[4] could just as easily have led to charges against the teen girls, the putative

seven percent of teen boys who have sexted say they sent this content to a boyfriend or girlfriend. *Id.* at 2.

[4] Like Judge Richman, I too would review T.B.'s challenges, although I come to a different result than his. *See People v. McCoy*, 2015 COA 76M, ¶ 70 (Webb, J., specially concurring); *People v. Rediger*, 2015 COA 26, ¶ 67 (Richman, J., specially concurring) (*cert. granted* Feb. 16, 2016).

victims here. Surely that is not how the legislature intended section 18-6-403(3)(b.5) to be applied. *See People v. Arapahoe Cty. Court*, 74 P.3d 429, 430-31 (Colo. App. 2003) (applying the principle that the court presumes that the General Assembly intended a just and reasonable result — and thus avoids interpretations leading to unjust or absurd results — before soundly rejecting a prosecution argument that, pursuant to 18-6-403(3)(b.5), defense counsel could not possess sexually explicit photographs needed to defend the client); *see also* Stephen F. Smith, *Jail for Juvenile Child Pornographers?*, 15 Va. J. Soc. Pol'y & L. 505, 525 (2008) (pointing out that, in many states, minors can marry or engage in consensual sex and arguing that, if the law considers a minor to be old enough to engage in sex, the minor should be treated as if he or she is old enough to document his or her sexual activity).

¶ 94    It is well established that a statute must set "minimal guidelines to govern law enforcement" and avoid the potential for discriminatory or arbitrary enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (citation omitted); *Trail Ridge Ford, Inc. v. Colo. Dealer Licensing Bd.*, 190 Colo. 82, 83-85, 543 P.2d 1245,

1246 (1975) (recognizing that where criminal or quasi-criminal sanctions are to be imposed, the threat of arbitrary enforcement of the law requires specificity). Given the incongruent application of section 18-6-403(3)(b.5) here, I must conclude that sufficient guidelines are not present. This lack of guidelines has led to a discriminatory enforcement of the conduct of T.B. — and not E.H. or L.B. — and an arbitrary enforcement of conduct that reasonable people could conclude is imprudent, but is not sexually exploitative such that the juvenile should be treated no differently than a pedophile or a distributor of child pornography. *See Arapahoe Cty. Court*, 74 P.3d at 430-31; *see also Curtiss v. People*, 2014 COA 107, ¶ 7 (rule of lenity requires courts to resolve ambiguities in the penal code in favor of a defendant's liberty interests). This statute could be misused to prosecute juvenile males differently than juvenile females, even where the juveniles may be similarly situated, depending on which gender sends or receives more sexts. *See* The National Campaign to Prevent Teen & Unplanned Pregnancy, *Sex and Tech: Results from a Survey of Teens and Young Adults* 2 (2008), available at https://perma.cc/E8PX-BEJD. The male sext

recipient in this case faced charges, while the female producers and distributors faced no legal consequences.

¶ 95    In 2009, the Colorado General Assembly amended two statutes to address the sexting phenomenon.  *See* Ch. 341, sec. 1, § 18-3-306, 2009 Colo. Sess. Laws 1792-93 (Internet luring of a child); Ch. 341, sec. 1, § 13-21-1002, 2009 Colo. Sess. Laws 1792 (computer dissemination of indecent material to a child).  These amendments lend further support to the proposition that section 18-6-403(3)(b.5) was never intended to be used in the way it was used against T.B.  Instead, the legislature intended the 2009 amendments to address texting violations when appropriate.

¶ 96    Section 18-3-306 — the Internet luring of a child provision — was altered as follows:

> **18-3-306. Internet luring of a child.** (1) An actor commits internet luring of a child if the actor knowingly communicates ~~a statement~~ over a computer or computer network, telephone network, or data network or by text message or instant message to a person who the actor knows or believes ~~is~~ to be under fifteen years of age ~~describing~~ and, in that communication or in any subsequent communication by computer, computer network, telephone network, data network, text message, or instant message, describes

50

explicit sexual conduct as defined in section 18-6-403(2)(e), and, in connection with ~~the communication~~ that description, makes a statement persuading or inviting the person to meet the actor for any purpose, and the actor is more than four years older than the person or than the age the actor believes the person to be.

Ch. 341, sec. 1, § 18-3-306, 2009 Colo. Sess. Laws 1792-93.

Although this provision covers sexting, it would not apply to fifteen-year-old L.B or to seventeen-year-old E.H. Nor would it apply to sixteen-year-old T.B., who was one year younger than E.H. and one year older than L.B.

¶ 97 During the same legislative session, section 13-21-1002, which imposes civil liability for disseminating indecent material to a child, was modified as follows:

**13-21-1002. Computer dissemination of indecent material to a child—prohibition.** (1) A person commits computer dissemination of indecent material to a child when: (a) Knowing the character and content of the communication which, in whole or in part, depicts actual or simulated nudity, or sexual conduct, as defined in section 19-1-103(97), C.R.S., the person willfully uses a computer, computer network, telephone network, data network, or computer system allowing the input, output, examination, or transfer of computer data or computer programs from one

51

computer to another or a text-messaging or instant-messaging system to initiate or engage in such communication with a person he or she believes to be a child[.]

Ch. 341, sec. 1, § 13-21-1002, 2009 Colo. Sess. Laws 1792.

Violations of section 13-21-1002, C.R.S. 2016, result in a civil penalty "established pursuant to verdict or judgment." § 13-21-1003(1), C.R.S. 2016.

¶ 98    These legislative amendments suggest that, rather than criminalizing sexting activity by and among teens, the legislature most likely intended that civil penalties be imposed pursuant to sections 13-21-1002 and 13-21-1003. *See* Lawrence G. Walters, *How to Fix the Sexting Problem: An Analysis of the Legal and Policy Considerations for Sexting Legislation*, 9 First Amend. L. Rev. 98, 121-22 (2010).

III.    T.B.'s Section 18-6-403 Adjudication Irreparably Brands Him as a Sex Offender, With all the Attendant Consequences

¶ 99    As a result of the court finding T.B. guilty of the two counts of sexual exploitation of a child under section 18-6-403(3)(b.5) for the photographs received from each teen girl, T.B.'s sentence includes these restrictions (among others):

- T.B. was required to register as a sex offender (thereby undermining the otherwise confidential nature of juvenile proceedings).

- T.B. was required to submit to and pay a fee for DNA testing.

- T.B. was required to actively participate in sex offender evaluation and treatment.

- T.B. was required to submit, at his expense, to psychological assessment and monitoring.

- T.B. was required to create a safety plan before attending a school environment.

- T.B. was restricted from the use of any Internet service, personal digital assistant devices, cell phones, and other like devices.

- T.B. was restricted from dating without prior approval (and if approved, was required to disclose the most private and intimate details of that relationship).

- T.B. had to submit to vehicle and residence searches.

- T.B. had to avoid overnight visits away from home without prior authorization.

- T.B. was required to refrain from contact with any children over the age of three without prior permission and was required to remove himself from any situation involving contact with children (even if incidental or accidental) and report that contact.

- T.B. was restricted from going, absent prior approval, to parks, playgrounds, recreation centers, arcades, and pools.

¶ 100    As evidenced by T.B.'s sentence, juvenile sexting adjudications can have far-reaching adverse consequences for the juvenile, especially where, as here, the juvenile is adjudicated delinquent for an offense categorized as a sexual offense or an offense that would require registration as a sex offender. Adjudications of delinquency for sex-related offenses can preclude the juvenile from the following:

- Retaining custody of his or her minor child (if the juvenile is already a parent, or becomes a parent while under court supervision) if a dependency court finds that return of the child to the parent presents safety or other concerns vis-a-

vis the child. *See People in Interest of D.P.*, 160 P.3d 351, 353-54 (Colo. App. 2007).

- Obtaining approval as a foster or adoptive parent. *See* § 26-6-104(7)(C), C.R.S. 2016 ("The state department shall not issue a license to operate . . . a foster care home [or] a residential child care facility . . . if the applicant . . ., an affiliate of the applicant, a person employed by the applicant, or a person who resides with the applicant . . . has been convicted of . . . [a]ny offenses involving unlawful sexual behavior [including those punishable under § 18-6-403.]").

- Pursuing certain occupations requiring working with children, like jobs in education, child care, and law enforcement. *See* 42 U.S.C. § 13041(c) (2012) ("Any conviction for a sex crime [or] an offense involving a child victim . . . may be ground for denying employment or for dismissal of an employee in [child protective services, social services, health and mental health care, child (day) care, education, foster care, residential care, recreational or

rehabilitative programs, and detention, correctional, or treatment services.]"); *see also* Dep't of Educ. Reg. 301-37, 1 Code Colo. Regs. 301-37:2260.5-R15.00(2)(o) (providing that violations of section 18-6-403(3)(b.5) and of similar laws can lead to denial, suspension or revocation of a teaching license); Dep't of Educ. Reg. 301-37, 1 Code Colo. Regs. 301-37:2260.5-R15.02(10).

- Returning to normalcy, as registration makes the juvenile's name, picture, and offense available to the public, including classmates and the press.

- Pursuing higher education, obtaining employment, or enlisting in the military. *See* Robert F. Shepard, Jr., *Collateral Consequences of Juvenile Proceedings: Part II,* 15 Crim. Just. 41 (Fall 2000).[5]

---

[5] An increasing number of college and financial aid applications inquire into juvenile adjudications, Robert F. Shepard, Jr., *Collateral Consequences of Juvenile Proceedings: Part II,* 15 Crim. Just. 42 (Fall 2000), and certain drug offenses can make an individual ineligible for financial aid. *See* Higher Education Act of 1965, 20 U.S.C. § 1091(r) (2012). While historically juvenile adjudications have not been characterized as criminal convictions in employment applications, many applications now include specific references to juvenile adjudications. *See* Shepard, 15 Crim. Just.

- Exercising driving privileges in certain situations. Barbara Fedders, *Two Systems of Justice, and What One Lawyer Can Do,* 12 Whittier J. Child & Fam. Advoc. 25, 35 (2012); *see also* §§ 42-2-125, -126, C.R.S. 2016. For juveniles who reside in rural communities with limited public transportation, the inability to drive may translate into an inability to work.

- Having a clean slate in subsequent judicial matters. *See* Michael Pinard, *The Logistical and Ethical Difficulties of Informing Juveniles about the Collateral Consequences of Adjudications,* 6 Nev. L. J. 1111, 1115 (2006). For example, Colorado sentencing law permits calculations of a "prior record score" to include juvenile adjudications of delinquency. *See People v. Perez-Hernandez,* 2013 COA 160, ¶ 49.

---

at 42. Juvenile adjudications of delinquency may also preclude eligibility for enlistment in the military. For example, based on the United States Army's classification system, juvenile delinquency adjudications qualify as criminal offenses. Army Reg. 601-210, ¶ 4-22(*v*) (Mar. 2013), available at https://perma.cc/U6FS-GFY5.

- Remaining in the United States, if the juvenile is not a citizen. *See, e.g.*, *Serrato-Navarrette v. Holder*, 601 F. App'x 734, 737 (10th Cir. 2015).

- Obtaining public housing, *see generally* Kristin Henning, *Eroding Confidentiality in Delinquency Proceedings: Should Schools and Public Housing Authorities be Notified?*, 79 N.Y.U. L. Rev. 520 (2004); Michael Pinard, *The Logistical and Ethical Difficulties of Informing Juveniles about the Collateral Consequences of Adjudications*, 6 Nev. L. J. 1111, 1114 (2006) (noting that housing authorities routinely conduct background checks for adult applicants and may "investigate whether any member of the family unit, including a juvenile member, has been convicted of specific disqualifying offenses"), and other public benefits, including Temporary Assistance for Needy Families and food stamps, *see* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, *as amended by* Balanced Budget Act of 1987, Pub. L. No. 105-33, 111 Stat. 251.

¶ 101     On top of state-based restrictions, the Adam Walsh Child

Protection and Safety Act of 2006 specifically mandates that

juveniles be included in sex offender registries. *See* 42 U.S.C.

§ 16911(8) (2012). The Adam Walsh Act requires states to

"substantially implement" the Sex Offender Registration and

Notification Act (SORNA) requirements or risk forfeiting ten percent

of the funds normally received from the federal Omnibus Crime

Control and Safe Streets Act of 1968. 42 U.S.C. § 16925(a) (2012).

Certain SORNA classifications can result in registration for twenty-

five years to life, and require in-person "show-ups" two to three

times each year, while failing to register can subject the person to a

maximum term of imprisonment greater than one year. 42 U.S.C.

§§ 16913(e), 16915, 16916 (2012). If T.B. moves — for educational

or employment opportunities — he may be required to register as a

sex offender in other states pursuant to each state's SORNA-

implementing legislation. *See, e.g.,* Del. Code Ann. tit. 11,

§ 4120(e)(1) (West 2013) (requiring registration in Delaware for

violation of substantially similar sex offense laws in another state);

Ohio Rev. Code Ann. § 2950.01(12) (West 2016) (same); *see also*

Nicole Marie Nigrelli, Comment, *Sex Offender Registry: Is it Attacking People That Were Not Meant to Be Part of the Law?*, 4 Suffolk J. Trial & App. Advoc. 343, 345 & n.15 (1999) (noting that all states have some form of child sex offender registration requirements).

¶ 102    For all the foregoing reasons, I would reverse juvenile T.B.'s adjudication — under section 18-6-403(3)(b.5) — based on receiving sexts from his teenage girlfriends E.H. and L.B.  Given this disposition, I need not address the remaining contentions.