22CA1174 Peo in Interest of DG 07-17-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1174
Larimer County District Court No. 20JD259
Honorable Daniel M. McDonald, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of D.G.,

Juvenile-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE GOMEZ
Meirink and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 17, 2025

---

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney General, Denver, Colorado, for Petitioner-Appellee

Megan A. Ring, Colorado State Public Defender, Mark Evans, Colorado State Public Defender, Denver, Colorado, for Juvenile-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    D.G., a minor, appeals his adjudication of delinquency for unlawful sexual contact. He contends that (1) his adjudication must be vacated due to a later-enacted legislative amendment; (2) the juvenile court erred in denying his request for a jury trial; (3) the evidence was insufficient to support his adjudication; and (4) the prosecutor's reference to a witness's credibility amounted to misconduct, requiring reversal. We disagree and therefore affirm the judgment.

## I.    Background

¶ 2    After the juvenile court denied D.G.'s request for a jury trial, the prosecution presented evidence supporting the following facts during a one-day bench trial.

¶ 3    When N.C. was eleven years old, his mother noticed him watching something on television that she deemed inappropriate for his age because it involved sexual content. N.C. said that he "already knew about those things" and disclosed that he and his female cousin, N.L., had engaged in sexual activities with their uncle, D.G.

¶ 4    N.C. submitted to a forensic interview during the investigation of the allegations. In the interview, N.C. explained that D.G. had

1

told him about sex and had said, "It's good for you." N.C. also reported that D.G. had shown him pornographic videos "a lot . . . like a hundred times." N.C. described three separate incidents occurring when he was between five and nine years old and when N.L., who is a few months older than him, was between five and ten.[1] All three incidents occurred at the children's grandfather's house — where N.C., N.L., and D.G. would sometimes spend the night — after their grandfather had gone to sleep.

¶ 5 During the first incident, N.L. sucked on N.C.'s and D.G.'s penises. During the second incident, N.L. sucked on N.C.'s penis, and N.C. licked N.L.'s vagina. D.G. wasn't present for this incident, but N.C. said D.G. told them to do it. N.C. also said that sometime after the second incident, D.G. touched his own penis and then showed N.C. his semen, or "white stuff." And during the final incident, N.L. sucked on N.C.'s and D.G.'s penises. While D.G. was waiting for his "turn" with N.C., he "played with himself."

---

[1] D.G., who is about five years older than N.C. and N.L., was between ten and fifteen years old during that time frame.

¶ 6 N.C. also revealed that his father had shown him pictures of naked people and that another child in his father's neighborhood had sucked on his penis.

¶ 7 At trial, N.C. testified to "experimenting" with N.L. because "[D.G.] was just talking about sex and all that stuff. . . . I didn't know what the heck I was doing." N.C.'s trial testimony about the three incidents differed in several respects from his descriptions during his forensic interview. For instance, N.C. testified at trial that he didn't participate in the third incident but just "watch[ed] [D.G. and N.L.] under the blankets." However, N.C. also testified that his memory of the incidents was better at the time of the forensic interview.

¶ 8 The petition in delinquency alleged that D.G. committed three counts of unlawful sexual contact.[2] The first two counts alleged that D.G. had sexual contact with N.L., who didn't testify at trial. The final count alleged that D.G. induced or coerced N.C. to engage in sexual contact with N.L. The court found D.G. guilty only as to

---

[2] The prosecution originally alleged four counts against D.G. but later amended the petition to allege only three.

the final count and sentenced him to twenty-four months of juvenile sex offender probation.

## II. Legislative Amendment

¶ 9     D.G. initially contends that his adjudication must be vacated because a later legislative amendment changed the language of the offense such that "[t]he single means of behavior under which the State charged [him] no longer exists." We disagree.

### A. Applicable Law and Standard of Review

¶ 10    A person commits unlawful sexual contact when they "knowingly, with or without sexual contact, induce[] or coerce[] a child by any of the means set forth in section 18-3-402[, C.R.S. 2024,] to expose intimate parts or to engage in any sexual contact, intrusion, or penetration with another person, for the purpose of the actor's own sexual gratification." § 18-3-404(1.5), C.R.S. 2024.

¶ 11    Section 18-3-402(1) provides eight different means by which a child may be induced or coerced under the unlawful sexual contact statute. *People v. Mena*, 2025 COA 14, ¶ 3. At the time of the offense, one of those enumerated means was "caus[ing] submission of the victim by means of sufficient consequence reasonably

4

calculated to cause submission against the victim's will." § 18-3-402(1)(a), C.R.S. 2021.

¶ 12    In 2022, shortly after D.G.'s adjudication, the General Assembly replaced that language with the current language: "caus[ing] sexual intrusion or sexual penetration knowing the victim does not consent." § 18-3-402(1)(a); *see also* Ch. 41, sec. 1, § 18-3-402(1)(a), 2022 Colo. Sess. Laws 214; *Mena,* ¶ 35.

¶ 13    A defendant may be entitled to the benefit of ameliorative legislation if they request such relief before their conviction becomes final — in other words, before the time to appeal expires or the mandate issues following an appeal. *People v. Cali,* 2020 CO 20, ¶ 21; *see also People v. Boyd,* 2017 CO 2, ¶ 9 (when the law changes during the pendency of a direct appeal, such that the conduct for which the defendant was prosecuted is no longer a crime, the prosecution is left "without authority to continue to prosecute," and the defendant's conviction must be vacated).  But regardless of the ameliorative nature of a legislative amendment, "we apply expressly prospective statutes only prospectively." *People v. Stellabotte,* 2018 CO 66, ¶ 29.

¶ 14    We review such questions of statutory interpretation de novo. *People in Interest of J.O.*, 2022 COA 65M, ¶ 13.

### B.    Application

¶ 15    We disagree with D.G.'s contention regarding the impact of the legislative amendment.

¶ 16    Even assuming the legislative amendment is ameliorative, it isn't retroactive.  The General Assembly made clear that the amendment "takes effect July 1, 2022, and applies to offenses committed on or after said date."  Ch. 41, sec. 2, 2022 Colo. Sess. Laws 214.  The charging period for D.G.'s offenses was between 2014 and 2018 — years before the amendment took effect.

¶ 17    Accordingly, D.G. isn't entitled to the benefit, if any, of the legislative amendment to section 18-3-402(1)(a).

### III.    Jury Trial

¶ 18    D.G. also contends that the juvenile court abused its discretion when it denied his request for a jury trial.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 19    A juvenile facing delinquency proceedings is statutorily entitled to a jury trial when they are alleged to have been an aggravated juvenile offender or to have committed an act that would

6

constitute a crime of violence if it was committed by an adult.
§ 19-2.5-610(1), C.R.S. 2024. For all other felony allegations, the
statute gives trial courts discretion to determine whether to
empanel a jury. *See id.*; *People in Interest of A.B.-B.*, 215 P.3d 1205,
1207 (Colo. App. 2009).

¶ 20 In determining whether to grant a jury trial in a juvenile
delinquency proceeding, a court should "balance the benefits of
informal, speedy and rehabilitative proceedings against the severity
of the offense, the nature of the consequences and the particular
facts of the case." *A.C. v. People*, 16 P.3d 240, 244 (Colo. 2001).

¶ 21 We review a court's ruling on a juvenile's request for a jury
trial in a delinquency proceeding for an abuse of discretion.
*A.B.-B.*, 215 P.3d at 1209. A court abuses its discretion if its
decision is manifestly arbitrary, unreasonable, or unfair or is based
on a misunderstanding or misapplication of law. *See id.*

## B. Application

¶ 22 In his request for a jury trial, D.G. argued that "[t]he severity
of the offenses, the nature of the consequences, and the particular
facts of the case . . . outweigh[ed] on balance any benefit to an
informal and speedy disposition." He further argued that this was

7

in part because "a trial on the charges alleged w[ould] involve . . . assessing the credibility of . . . the named victims . . . who were young children at the time of the alleged offenses" and because his "possible sentence exceed[ed] the usual juvenile sentencing structure and could have far reaching implications outside of what [he] would normally face for any other charges."

¶ 23 The juvenile court rejected those arguments and denied D.G.'s request for a jury trial, reasoning,

> I do not think it's in his best interests and I do not think it's in any of the youths involved in this case best interest to do . . . a jury trial versus a court trial, and . . . I think that that outweighs any possible detriment to [D.G] because given the nature of these charges and the way they're being presented, the consequences are really not much more than any other type of juvenile case. And weighing . . . the potential trauma factors to [D.G.] as well as witnesses . . . , the court finds that it would not be appropriate in this case.

¶ 24 The court's reasoning indicates that it considered and balanced the "the benefits of informal, speedy and rehabilitative proceedings against the severity of the offense, the nature of the consequences and the particular facts of the case," *A.C.*, 16 P.3d at

244, in concluding that D.G.'s interest in a jury trial was outweighed by potential detriments to himself and other witnesses.

¶ 25 We therefore disagree with D.G.'s argument that the court ignored the relevant factors. We also disagree with his arguments challenging the juvenile court's weighing of those factors — particularly whether his potential sentence was significantly greater than that applicable to other, non-sex offense adjudications and whether he and the other potential witnesses might be traumatized by a jury trial. It was within the juvenile court's discretion to assess and weigh these matters, and we cannot say that its reasoning in doing so exceeded the bounds of its discretion. *See A.B.-B.*, 215 P.3d at 1209.

¶ 26 Accordingly, we conclude that the juvenile court didn't abuse its discretion by denying D.G.'s request for a jury trial.

## IV. Sufficiency of the Evidence

¶ 27 Next, D.G. contends that the prosecution didn't present sufficient evidence to prove beyond a reasonable doubt that he induced or coerced N.C. to engage in sexual contact. Again, we disagree.

9

## A. Applicable Law and Standard of Review

¶ 28　We review claims challenging the sufficiency of the evidence de novo, determining whether the evidence presented was sufficient in both quantity and quality to support a juvenile's adjudication. *See McCoy v. People*, 2019 CO 44, ¶ 63; *see also People in Interest of J.R.*, 216 P.3d 1220, 1221 (Colo. App. 2009) ("When reviewing the sufficiency of the evidence supporting an adjudication of juvenile delinquency, the standards are the same as those used in a criminal case."). In doing so, we assess whether the evidence, both direct and circumstantial, viewed in the light most favorable to the prosecution, supports a reasonable conclusion that the juvenile is guilty beyond a reasonable doubt. *See McCoy*, ¶ 63.

¶ 29　However, "we 'may not serve as a thirteenth juror' by considering whether we 'might have reached a different conclusion than the [fact finder].'" *Thomas v. People*, 2021 CO 84, ¶ 10 (quoting *People v. Harrison*, 2020 CO 57, ¶ 33). Thus, we will disturb the verdict only if, despite drawing every reasonable inference in favor of the prosecution, the record is unsubstantial and insufficient to support a guilty verdict beyond a reasonable doubt. *Clark v. People*, 232 P.3d 1287, 1291-92 (Colo. 2010).

¶ 30     As outlined above, a person commits unlawful sexual contact when they "knowingly, with or without sexual contact, induce[] or coerce[] a child by any of the means set forth in section 18-3-402 to expose intimate parts or to engage in any sexual contact, intrusion, or penetration with another person, for the purpose of the actor's own sexual gratification." § 18-3-404(1.5).

¶ 31     The prosecution alleged in this case, under section 18-3-402(1)(a), C.R.S. 2021, that D.G. "induced or coerced [N.C.]" and "caused [his] submission . . . by means of sufficient consequence reasonably calculated to cause submission against [his] will." As applied here, the reasonable calculation component means that D.G. must have actively considered that his conduct would overcome N.C.'s will to not engage in sexual contact. *See People v. Komar*, 2015 COA 171M, ¶ 42; *see also People v. Smith*, 638 P.2d 1, 5 n.7 (Colo. 1981) ("[T]he actor must be aware that [their] conduct is sufficient in character and degree to be likely to cause nonconsensual submission.").

## B.    Application

¶ 32     D.G. contends that the prosecution didn't provide sufficient evidence to establish that he induced or coerced any sexual contact

because none of the evidence relating to the three incidents proves that he induced or coerced N.C.'s actions. Moreover, D.G. argues, even if he suggested the sexual activity, that doesn't amount to inducement or coercion, and "[t]here is no evidence that N.C. had any will not to engage, or that D.G. did anything to overcome it."

¶ 33　We disagree and conclude that, when viewed in the light most favorable to the prosecution, the following evidence is substantial and sufficient to support a conclusion by a reasonable fact finder that D.G. "cause[d] [the] submission of [N.C.] by means of sufficient consequence reasonably calculated to cause submission against [his] will." § 18-3-402(1)(a), C.R.S. 2021.

- D.G. is more than five years older than N.C. During the relevant time period, D.G. was between ten and fifteen years old, while N.C. was only between five and nine.

- D.G. is N.C.'s uncle, they saw each other frequently, and they had a good relationship, such that N.C.'s mother described them as "like brothers" in some ways.

- N.C. stated at trial and during his forensic interview that D.G. showed him pornographic videos on numerous occasions to "make [him] understand what sex was."

- N.C. stated, "I didn't know what I was doing when I was little." But he said he participated in the sexual conduct because D.G. had shown him how to do it through the pornography and had said, "It's good for you."

- N.C. frequently repeated during his forensic interview that the sexual contact and pornography was "gross" and "nasty." N.C. also said, "[D.G.], my uncle, is kind of a creep. I kind of don't feel safe around him."

- N.C. testified that the incidents all occurred in an area of their grandfather's home away from their grandfather, and that they would end if they heard their grandfather waking up.

¶ 34 It is true, as D.G. points out, that N.C. gave conflicting accounts of what happened during his forensic interview and his trial testimony. And some evidence — such as N.C.'s viewing of photos of naked people with his father, his encounter with another child in his father's neighborhood, and his statements about "experimenting" — may have supported a finding that the conduct wasn't induced or coerced. But we don't assess the credibility of witnesses or resolve inconsistencies in the evidence. *See People in*

13

*Interest of K.D.W.*, 2020 COA 110, ¶ 38.  Rather, drawing every reasonable inference in favor of the prosecution, as we must, we conclude that the evidence was sufficient to establish beyond a reasonable doubt that D.G. induced or coerced N.C. into sexual contact.  *See Komar*, ¶ 42; *Smith*, 638 P.2d at 5 n.7; *see also People v. Walker*, 321 P.3d 528, 540-41 (Colo. App. 2011) (finding sufficient evidence to establish the defendant's inducement or coercion of the victims), *aff'd in part and vacated in part on other grounds*, 2014 CO 6.

## V.    Prosecutorial Misconduct

¶ 35    Finally, D.G. contends that the juvenile court plainly erred by allowing the prosecutor to engage in misconduct during the trial.  Specifically, he cites the prosecutor's references to N.C.'s credibility during the witness examinations and closing argument.  We discern no plain error.

### A.    Additional Facts

¶ 36    On redirect examination, the prosecutor elicited testimony from N.C. suggesting that his memory of events was more accurate in his forensic interview than at trial.  The prosecutor also elicited

testimony indicating that N.C. had been truthful during the forensic interview:

> Q. Do you remember [the forensic interviewer] talked about the rules of like, if you didn't remember something, not to guess. Do you remember that?
>
> A. Yeah.
>
> Q. Okay. And if — a rule about always telling the truth, right, in the room? Yeah?
>
> A. Yeah.
>
> Q. Okay. And you said you remember giving that interview with the lady. Do you remember if you tried your best to follow all the rules in that interview?
>
> A. Yes, I tried as hard as I could.

¶ 37 Then, during closing argument, the prosecutor made the following challenged statements regarding N.C.'s credibility:

- "[N.C.] had told . . . the interviewer that he understood he needed to tell the truth and tell what happened to him. . . . [H]e starts off by talking to [the interviewer] about the details of his day. He was very detailed about the things that happened that day, and he was honest with her. He is so honest that he goes on to tell the interviewer about how he got in trouble earlier that day

15

because he was misbehaving. He is not trying to hide anything."

- "[N.C.'s mother] also told the Court that [N.C.] really struggled with this after he came forward, that he acted out towards her, that he was angry at her for reporting this, that he ran away a couple times, that he was suicidal, and one of those times that he ran away, he even ran to [D.G.] This is very consistent behavior that we have seen from a kid who was really close to somebody who hurt them, and now he can't see them anymore."

¶ 38    Defense counsel didn't object to any of these questions, answers, or statements.

B.    Applicable Law and Standard of Review

¶ 39    Prosecutors may not offer their own personal opinions about a case, *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005), or imply that they have specialized knowledge and expertise to which a fact finder should defer, *People v. Davis*, 280 P.3d 51, 54 (Colo. App. 2011). Nor may prosecutors elicit testimony that improperly bolsters another witness's credibility by directly or

16

indirectly implying that the witness was telling the truth on a particular occasion. *Venalonzo v. People*, 2017 CO 9, ¶ 32; *People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009).

¶ 40 When, as here, there was no contemporaneous objection, we review a claim of prosecutorial misconduct for plain error. *People v. Rhea*, 2014 COA 60, ¶ 43. "To constitute plain error, misconduct must be flagrant or glaring or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Id.* (quoting *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004)). Prosecutorial misconduct rarely constitutes plain error. *People v. Knapp*, 2020 COA 107, ¶ 47.

### C. Application

¶ 41 As an initial matter, we disagree with D.G.'s assertion that the prosecutor improperly offered her own personal opinions of N.C.'s credibility or implied that the court should defer to her specialized knowledge and expertise. Instead, the challenged statements from the prosecutor's closing argument, read in conjunction with other related statements she made in closing, simply reflect her argument, based on a commonsense interpretation of the evidence

17

presented at trial, that N.C.'s statements during the forensic interview were credible. That was proper. *See People v. Curtis*, 2021 COA 103, ¶ 54 ("It's proper for a prosecutor to argue — based on reasonable evidentiary inferences — why the [fact finder] should or shouldn't believe a witness."); *People v. Wilson*, 2014 COA 114, ¶ 55 ("[T]he prosecutor was drawing reasonable inferences from the evidence rather than professing her personal opinion as to [the victim's] veracity.").

¶ 42     Moreover, the prosecutor's questioning of D.G. about the "rule" that he tell the truth during his forensic interview didn't elicit the kind of bolstering testimony Colorado courts have found impermissible. Instead, it "merely elicited testimony *from the victim* about the truthfulness of [his] *own* testimony, which does not constitute bolstering as discussed in *Wittrein* and *Venalonzo*." *People v. West*, 2019 COA 131, ¶ 42. Thus, the questioning and the later argument about it were not impermissible — and certainly were not plainly so. *See id.* at ¶¶ 34-35, 42, 44 (the trial court didn't err, much less plainly err, by admitting a child victim's testimony that she'd been told "the number one rule about testifying" was to "[t]ell the truth" and that she'd followed that rule);

*People v. Coughlin,* 304 P.3d 575, 582-83 (Colo. App. 2011) (the trial court didn't err by admitting a witness's testimony that he'd been instructed to testify honestly).

¶ 43　　Finally, even if the juvenile court had erred in allowing any of the evidence or argument, it wouldn't constitute plain error for the additional reason that there's no "indication in th[e] record" that the court, as the fact finder in this case, "was improperly swayed by" that evidence or argument. *People v. Liggett,* 114 P.3d 85, 89 (Colo. App. 2005) (potential prosecutorial misconduct during a bench trial didn't constitute plain error), *aff'd,* 135 P.3d 725 (Colo. 2006); *see also People v. White,* 870 P.2d 424, 440 (Colo. 1994) ("Trial judges are presumed to know the law and to apply it in making their decisions." (quoting *Walton v. Arizona,* 497 U.S. 639, 653 (1990))) (emphasis omitted); *Liggett,* 135 P.3d at 733 ("In the context of a bench trial, the prejudicial effect of improperly admitted evidence is generally presumed innocuous."). Accordingly, any potential error does not cast serious doubt on the reliability of the judgment of conviction. *See Rhea,* ¶ 43.

## VI.　Disposition

¶ 44　　The judgment is affirmed.

JUDGE MEIRINK and JUDGE BERNARD concur.